DECISION
Defendant-appellant, Welch Ohio, LLC ("Welsh"), appeals the judgment of the Franklin County Court of Common Pleas rendered in favor of plaintiff-appellee, Bradford L. Kitchen. By its judgment, rendered upon the verdict of a jury, the court ordered that Welsh pay Kitchen $343,881.52 in damages.
Welsh is a commercial real estate broker involved in the purchase, sale and leasing of commercial real estate on behalf of its clients. Welsh employed Kitchen, a licensed real estate salesman, from October 7, 1998 until July 29, 1999. Kitchen filed this lawsuit after his departure from Welsh. Kitchen alleged that: (1) Welsh breached its contract by failing to compensate Kitchen pursuant to the parties' agreement; and (2) Welsh converted Kitchen's property by failing to return Kitchen's files and notes.
As to Kitchen's claim for breach of contract, evidence at trial demonstrated that Kitchen's employment relationship with Welsh was governed by two documents, the Letter Agreement and the Employee Broker Agreement. The Letter Agreement, signed by the parties on October 6, 1998, stated that Kitchen would be vice-president of Corporate Services, and defined his job responsibilities as follows:
 Provide leadership in the Columbus, Ohio office for corporate services on a regional basis. You will work closely with me and Kevin Farrell in identifying targets, strategizing for the attack and winning the business. All the resources of Welsh Companies will be at your disposal, including administrative support, research, asset management, facilities management, construction, development, mortgage brokerage, leasing and sales, etc. We will look to you to serve as the principal "rainmaker" responsible for developing long-term corporate services relationships.
The Letter Agreement included the following provisions for Kitchen's compensation structure:
 We realize the risk associated with any transition from one firm to another and have structured the following compensation plan to dampen any fluctuations in cash flow. Specifically, your first year compensation will be as follows:
Salary: $75,000
Bonus: 70% of gross in-house fees greater than $150,000
generated after co-op split
Your compensation after year one will be as follows:
Salary: $75,000
Bonus: 60% of gross in-house fees generated after co-op
split between $150,000 and $200,000
65% of gross in-house fees generated after co-op
split greater than $200,000 and less than $600,000
70% of gross in-house fees generated after co-op
split greater than $600,000
In addition to providing specific provisions regarding Kitchen's employment at Welsh, the Letter Agreement also directed Kitchen to "thoroughly review and sign the enclosed Employee Broker Agreement."
The Employee Broker Agreement, signed by the parties on October 7, 1998, contained the following provision with regard to compensation:
 All services performed by the Employee shall be compensated by payment of a portion of the brokerage fee charged by Welsh as set forth below. When the Employee shall have performed any work hereunder, said fee when collected by Welsh shall be divided between Welsh and Employee in the manner set forth in a written policy statement to be prepared by Welsh, as amended by Welsh from time to time.
The Employee Broker Agreement also contained the following provision regarding payment of brokerage fees to an employee after termination of the employment relationship:
 When Employee's employment has been terminated for any reason, the Employee's regular proportionate share of Brokerage fees on any transactions Employee has made
that are not closed shall be considered Employee's property, and upon closing of said transactions, said proportionate share of the Brokerage fee shall be paid to Employee. In the event Employee leaves and has transactions or listings pending that require further work normally rendered by Employee, the Employee and Welsh, or Welsh alone, shall make arrangements with another Employee in the organization to perform the required work, and the Employee assigned shall be compensated for taking care of pending transactions or listings. (Emphasis added.)
Kitchen testified that, while he was interviewing for the job, he informed Welsh that he had a developing relationship with Huntington National Bank ("Huntington"). In fact, Kitchen testified that he wanted to work for Welsh because his prior employer did not have the staff necessary to handle an account as large as the one Kitchen anticipated from Huntington. Once he was employed by Welsh, Kitchen pursued the opportunity with Huntington. In November 1998, Welsh and Huntington entered into an indemnification agreement by which Huntington selected Welsh as its "outsource Corporate Service partner" and agreed to reimburse Welsh for "reasonable costs incurred by Welsh for internal salaries of Brad Kitchen, other Welsh support personnel and out of pocket costs * * * less revenue received by Welsh Ohio from transactions resulting from the Huntington National Bank/Welsh relationship."
On December 22, 1999, five months after Kitchen's termination from Welsh, Huntington and Welsh signed a Corporate Services and Master Exclusive Listing Agreement, which memorialized the terms of their relationship. Pursuant to the agreement, Welsh receives a six per cent commission for most types of transactions, such as acquiring a new lease for a Huntington branch location or disposing of a branch location that is no longer needed. For certain transactions such as lease renewals, however, Welsh received a reduced commission or no commission at all.
At trial, Kitchen claimed that he is contractually entitled to $346,399.42 as his portion of brokerage commissions on closed transactions. Welsh agreed that it owed Kitchen $52,802.58 on the contract claim, as Kitchen was entitled to $52,802.58 in commission for transactions that had closed since Kitchen's departure.[1] Welsh denied that it owed Kitchen any additional compensation.
As part of his claim for breach of contract damages, Kitchen claimed he is entitled to a $159,229.88 bonus for subleasing more than two floors of office space located in the Huntington Center in Columbus to Ernst 
Young. Kitchen alleged that the Ernst Young sublease was a "transaction" that he "made," entitling him to a bonus under the terms of the Employee Broker Agreement. Kitchen testified that, during his employment with Welsh, he discussed with Byron Wilson, Huntington's vice-president of Corporate Real Estate, the benefit of subleasing part of the Huntington Center office space. Kitchen testified that he encouraged Wilson to relocate Huntington's operations from the Huntington Center to a remote location as a way of increasing Huntington's real estate portfolio value. Kitchen admitted, however, that the concept of subleasing office space at the Huntington Center had already occurred to Wilson.
Wilson testified that he did not recall having any discussions with Kitchen concerning subleasing office space in the Huntington Center. Wilson testified that Huntington had considered whether it would be advisable to relocate operations from the Huntington Center to a location in northeast Columbus. According to Wilson, however, Huntington decided not to use Welsh to advise Huntington regarding this move because Wilson was concerned that Welsh would have a conflict of interest. Huntington hired Ohio Equities to explore the merits of subleasing office space in the Huntington Center. Wilson testified that in late September 1999, two months after Kitchen's departure from Welsh, Wilson received a letter from a Chicago broker representing Ernst Young inquiring whether Huntington had office space available for sublease in the Huntington Center. After Huntington received the inquiry about Ernst Young, Wilson assigned the Huntington Center sublease project to Welsh. Wilson testified that Kitchen played "[n]o role whatsoever" in Huntington's decision to sublease space in the Huntington Center.
With regard to Kitchen's claim for conversion, Kitchen testified that on the day he was terminated, he tried to collect his personal possessions but was denied admittance to the offices. Within three days of his termination, Kitchen filed the instant action and alleged that Welch unlawfully maintained control over his property. Kitchen was permitted to collect some of his belongings ten days after his termination, and he again demanded the return of all of his property. Kitchen received a few additional items on two occasions, but he testified that he has yet to receive everything. According to Kitchen, the files that Welsh did not return to him contained information he could have used to generate income. Kitchen testified that he could have made $240,000 if he had access to the files at issue.
On cross-examination, Kitchen testified as follows when confronted with his deposition transcript:
 Q. Well, let's take a look at the deposition we took on May 4th. Do you have a copy in front of you?
A. Uh-huh.
 Q. Now, again, May 4th, that's a couple months ago. You were under oath. Go to Page 153 starting on Line 1. Didn't I ask you the following question: Did you call Donna Griffin on August 2nd to say you had received everything except a proposal that you had submitted to the Huntington when you were at Matrix? And what was your answer?
A. I said sounds correct.
Kitchen also acknowledged that, on August 4, two days after this phone call, Donna Griffin sent Kitchen a copy of the proposal that Kitchen had submitted to Huntington when Kitchen was with Matrix. Although he now claims that Welsh did not send him a complete copy of the proposal, Kitchen admitted that he signed an acknowledgment form indicating he received the proposal. Kitchen did not indicate anywhere on the acknowledgment form that he did not receive a complete version of the proposal. As to his $240,000 damages calculation, Kitchen admitted he had stated in his deposition that his attorney had performed the calculations to arrive at that figure.
The jury was asked to render general verdicts on the breach of contract and conversion claims. The jury was also asked to answer two special interrogatories concerning the proper construction of the contracts between Welsh and Kitchen. The jury concluded that Welsh had breached its contract with Kitchen and that Kitchen was entitled to $276,683.52 in damages. The jury also concluded that Welsh had converted Kitchen's property and that Kitchen was entitled to $120,000 in damages. With respect to the special interrogatories, the jury concluded that: (1) Kitchen was not entitled to a fifty percent commission on the first $150,000 of gross in-house fees; and (2) Welsh was not entitled to deduct costs paid to other employees to close transactions from the amounts to be credited to Kitchen.
On appeal, Welsh asserts the following assignments of error:
The jury's $276,683 general verdict for breach of contract is irreconcilable with its special interrogatory response that Plaintiff was not entitled to a bonus for 50% of the first $150,000 of gross in-house fees.
The Trial Court's judgment is contrary to law and unsupported by the evidence because under the terms of his contract, Plaintiff was not entitled as a matter of law to a bonus of $159,229.80 for the Ernst 
Young transaction.
Because the terms were not ambiguous or in need of construction, interpretation of the written agreements between the parties was a question of law for the Trial Court and not one of fact for the jury, and the Trial Court erred when it failed to properly instruct the jury.
Plaintiff's failure to demand the return of his files precludes recovery upon his conversion claim as a matter of law, and the Trial Court erred by:
 (a) overruling in part Defendant's motion for summary judgment on the conversion claim;
 (b) refusing to instruct the jury that a demand for return of the property is an essential element of a conversion claim.
The Trial Court's judgment for conversion is not supported by the evidence because plaintiff failed to offer any credible evidence in support of his claimed damages for conversion.
For the reasons that follow, we reverse the judgment of the trial court on both claims and remand this case for a new trial.
For clarity, we address Welsh's assignments of error out of order. By its second assignment of error, Welsh argues that the trial court's judgment on the breach of contract claim is contrary to law and unsupported by the evidence because it includes an award for damages for the Ernst Young transaction. We agree. We conclude that a portion of the judgment on the contract claim compensated Kitchen for a commission on the Ernst Young transaction, damages to which Kitchen is not entitled as a matter of law. Because we are unable to ascertain from the record the amount of damages awarded by the jury for the Ernst Young transaction, we remand this case for a new trial on the breach of contract claim.
On appeal from a judgment rendered on a jury verdict, the appropriate standard of review is whether the judgment of the trial court is contrary to law. We will not disturb the trial court's judgment if it is "supported by some competent, credible evidence going to all the essential elements of the case * * *." C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, syllabus. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment * * *." Estate of Barbieri v. Evans (1998), 127 Ohio App.3d 207,211.
Kitchen contends that, in reviewing the jury's verdict, we must disregard all evidence favorable to Welsh. Citing to Reeves v. SandersonPlumbing Products, Inc. (2000), 530 U.S. 133, Kitchen argues that we may only consider Kitchen's own testimony and uncontradicted evidence offered on his behalf. Even assuming that Kitchen has articulated the proper appellate standard, however, we conclude there is insufficient evidence to support a finding that Kitchen is entitled to a commission on the Ernst 
Young transaction.
Under the terms of the Employee Broker Agreement, Kitchen is entitled to brokerage fees on any "transactions" that he "has made." We conclude that there is no evidence that Kitchen made the Ernst Young lease transaction. By his own testimony, Kitchen's only connection to the Ernst Young transaction was his general discussion with Wilson regarding the concept of relocating operations from the Huntington Center in order to free up office space for lease. Kitchen admitted, however, that Wilson was already familiar with the concept. Kitchen provided no evidence that he performed any specific work to secure tenants or that he suggested any potential tenants to lease the Huntington Center space. Kitchen provided no evidence that he did anything whatsoever to procure Ernst Young as a tenant. On this record, we conclude there is no evidence from which a jury can conclude that Kitchen is entitled to any commission for the Ernst Young transaction. We therefore reverse the judgment to the extent it reflects damages awarded as commission compensation for the Ernst Young transaction.
We cannot determine from the record which portion of the damages award compensated Kitchen for the Ernst Young transaction. Kitchen alleged that Welsh owed him a total of $346,399.42 in damages on his breach of contract claim. Included in Kitchen's calculation was $159,299.88 that Kitchen alleged he was due from the Ernst Young transaction. The jury awarded $276,683.52 in damages on the breach of contract claim. Based on the amount awarded, we know the damages award included compensation for the Ernst Young transaction. Because the award was less than the total amount demanded by Kitchen, however, we are unable to ascertain how much of the total award reflected compensation for the Ernst Young transaction. We are also unable to determine on which of the other disputed transactions the jury imposed breach of contract liability and awarded damages. Accordingly, we remand this case for a new trial on the breach of contract claims pertaining to transactions other than the Ernst Young transaction. See Iames v. Murphy (1995), 106 Ohio App.3d 627,632-633 (concluding a new trial should be granted when the court cannot ascertain from the record how the jury assessed liability and damages). In light of our resolution of Welsh's second assignment of error, we render Welsh's first and third assignments of error moot. See App.R. 12(A)(1)(c).
By its fourth assignment of error, Welsh contends that the evidence demonstrated Kitchen failed to demand the return of his files and that, in order to recover on his claim for conversion, it was Kitchen's burden to prove he made a demand. Welsh argues that the trial court, therefore, erred when it failed to award summary judgment in Welsh's favor on the entire conversion claim (the court had granted partial summary judgment on the basis that the undisputed evidence demonstrated that several items had been returned to Kitchen). Welsh further argues that the trial court erred when it failed to instruct the jury that a demand for the return of property is an essential element of a claim for conversion. Although we conclude that issues of fact precluded resolution of the entire conversion claim by summary judgment, we agree that the trial court erred in instructing the jury on the law regarding conversion.
The trial court did not err when it declined to grant summary judgment as to ten specific items on Kitchen's claim for conversion. Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd.of Commrs. (1997), 123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181, 183.
Under Ohio law, "[a] conversion is recognized as any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights." OhioTel. Equip. Sales, Inc. v. Hadler Realty Co. (1985), 24 Ohio App.3d 91,93. In addition, "[a] demand and refusal in a conversion action are usually required to prove the conversion of property otherwise lawfully held." Id. at 94. In order to prove conversion of property that came into the rightful control of the possessor, therefore, the owner must demonstrate that: (1) he demanded the return of the property from the possessor after the possessor exerted dominion or control over the property; and (2) the possessor refused to deliver the property to its rightful owner. See id. at 93-94.
In his opposition to Welsh's motion for summary judgment, Kitchen testified by affidavit as follows:
 I still have not received my original Huntington Proposal that I drafted while at Matrix; my Huntington files that consist of documents prepared while I was employed by Matrix and Welsh; my stenographer's notepads which contain my phone journal and phone messages; the Mt. Carmel file; and information that was contained in the Alter file, the Esquire file, the Insilco file, Sawmill Road file, the Watkins Road file, and in the Morse Road Lifestyles file.
Kitchen also testified that he and his attorney requested on several occasions that Welsh return Kitchen's files and documents. We agree with the trial court that Kitchen's testimony raised genuine issues of material fact regarding whether Welsh converted the items that Kitchen claimed he did not receive. Accordingly, we overrule Welsh's fourth assignment of error as it pertains to the trial court's ruling on its motion for summary judgment.
We further conclude, however, that the trial court erred by refusing to instruct the jury that a demand for the return of property is an essential element that Kitchen had to prove in order to recover on his claim of conversion. When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. State v.Wolons (1989), 44 Ohio St.3d 64, 68. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219.
In the instant matter, Welsh requested that the jury instruction on conversion include, in part, the following language:
 If you find from the greater weight of the evidence that the plaintiff was the owner of the property in question and entitled to the immediate possession thereof, and that he made demand for the return of that property, and was deprived of that possession by an unauthorized act of the defendants, or by the exercise of dominion over the property inconsistent with the right of possession of the plaintiff, it is a conversion of the property. (Emphasis added.)
The trial court declined to give the instruction requested by Welsh and opted instead for the following instruction offered by Kitchen:
 If you find from the greater weight of the evidence that the plaintiff was the owner of the property in question and entitled to the immediate possession thereof, and was deprived of that possession by an unauthorized act of the defendant, or by the exercise of dominion over the property inconsistent with the right of possession of the plaintiff, it is a conversion of the property.
Welsh objected to the court's instruction on the grounds that it omitted from the definition of conversion the requirement that Kitchen must demand return of his property.
We conclude that the trial court abused its discretion when it refused, over Welsh's objection, to instruct the jury regarding the demand element of conversion. See State v. Wilcox (Oct. 25, 1996), Ashtabula App. No. 95-A-0060, unreported (holding that the trial court abused its discretion and committed plain error because it failed to instruct the jury on an essential element of a claim). A charge to the jury should be a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced. Marshallv. Gibson (1985), 19 Ohio St.3d 10, 12. Requested instructions should ordinarily be given if they are correct statements of law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the specific instruction. Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585, 591.
In the instant matter, there was evidence Kitchen told Welsh's office manager in August 1999 that he had received all of his property except for the Huntington proposal Kitchen drafted when he was at Matrix. There was also evidence that Kitchen acknowledged receipt of the Huntington proposal two days after he spoke with the office manager. We conclude that, on the basis of this evidence, a reasonable jury might have concluded that Welsh is not liable for conversion because Kitchen did not demand the return of property after he indicated that he had received his property in early August 1999, just over a month after his termination. The trial court's instruction on conversion, however, failed to inform the jury that a plaintiff must prove that he demanded the return of his property.
Kitchen argues that the trial court was not required to instruct the jury about the element of demand for return of the property because Welsh never lawfully held the property. We disagree. Although a plaintiff need not prove that he demanded return of his property in every circumstance, we conclude that a demand was necessary in the instant matter.
The "demand and refusal" element is dependent upon the character of the original possession. "[I]f the original taking was rightful and no act of dominion or control inconsistent with plaintiff's ownership had taken place, a demand and refusal are necessary." Ohio Tel. Equip. Sales,supra, at 94. "Where the object of a conversion has been acquired lawfully, the possessor of such property cannot be held to have converted it, or to wrongfully possess it until, upon demand, the possessor fails to restore the object to one who has a right to possess it." Bourekis v.Saidel Assoc. (June 22, 1994), Montgomery App. No. 14105, unreported.
In the instant matter, there was no indication that Welsh came into physical possession of Kitchen's files and records unlawfully. Rather, the evidence demonstrated that Kitchen brought the items at issue with him to his new office when he began his employment with Welsh. Evidence also suggested that Kitchen informed Welsh in August 2000 that he had received all of his property. Under these circumstances, we conclude that it was incumbent upon Kitchen to prove that he demanded the return of the possessions he voluntarily brought with him when he began his employment with Welsh.
We therefore sustain Welsh's fourth assignment of error with regard to the trial court's jury instruction and remand this case for retrial on the claim for conversion. In light of our resolution of Welsh's fourth assignment of error, we render Welsh's fifth assignment of error moot. See App.R. 12(A)(1)(c).
For the foregoing reasons, we sustain Welsh's second assignment of error, overrule in part and sustain in part Welsh's fourth assignment of error, and render moot Welsh's first, third and fifth assignments of error. Therefore, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand this case to that court for further proceedings consistent with this opinion.
 _____________________ BROWN, J.
LAZARUS and KENNEDY, JJ., concur.
[1] Because Welsh admitted in its opening statement that Kitchen was entitled to $52,802.58, the trial court entered a partial directed verdict in Kitchen's favor for that amount. The trial court and the parties agreed that the jury would not be informed of the directed verdict determination but that the amount would simply be deducted from the jury's total verdict.